[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Smithfield Associates, LLC and Zane R. Megos, Jr., bring this action against the defendant, Tolland Bank, alleging in a two-count complaint: breach of contract and violations of the Connecticut Unfair Trade Practices Act. The defendant has counterclaimed for attorneys fees under the promissory notes signed by the plaintiffs. The court, Hurley, J., conducted the trial on September 24 and 26, 2002. The last brief was filed on October 24, 2002.
This action concerns two promissory notes through which the defendant loaned the plaintiff Smithfield Associates $135,000.00 ("note 12511") to purchase property located at 60 Smith Avenue, Norwich, CT, and, $124,000.00 ("note 12557") to purchase property located at 54-56 Broadway, Norwich, CT. The notes were executed on June 22, 1998, and September 3, 1998, respectively. Zane R. Megos, Jr., signed both notes as president of Smithfield Associates, LLC.
Note 12511 stated in relevant part, "Payments of principal and interest due hereunder shall accrue at a fixed rate of nine and one half percent (9.50%) for the first two years, and shall be paid in arrears in consecutive monthly installments of One Thousand One hundred Sixty-Six Dollars and 98/100 ($1,166.98) (such installments based on a 20 year amortization) commencing on October 3, 1998 (the `Commencement Date'). At the end of the first two years and every two years thereafter, the interest rate shall be adjusted to the Federal Home Loan Bank Board two year non-amortizing rate plus 3.65%, and continue on the concurrent date of each and every month thereafter until September 3, 2008 (`Maturity Date')." "Without prejudice to any other rights of Holder, Maker shall pay to Holder a late charge equal to five percent (5%) of any payment of interest or other payment due hereunder which is not received by Holder within ten (10) calendar dates of the due date thereof. Such late charge shall be made for each payment period for which any payment is delinquent." "Interest after maturity or default shall increase to three percent (3%) above the then existing interest rate in effect at the time CT Page 1987 of such maturity and/or default until paid."
Note 12557 contains the same terms except that the fixed rate for the first two years would be 9.75%; the monthly installments would be One Thousand Two Hundred Ninety-Three Dollars and 27/100 ($1,293.27); and the payments would commence on July 22, 1998.
In December 1999, a dispute arose between the plaintiffs and the defendant as to whether the payments on both mortgages were current. In an agreement ("Agreement") dated September 1, 2000, signed by the plaintiffs on that same day and signed by a representative of the defendant on September 28, 2000, the plaintiffs agreed to bring their payments current by applying a $15,000 certificate of deposit to the arrearages and by making two lump sum payments of $6,625.03 and $2,264.66 on or before September 8, 2000. The plaintiffs also agreed to pay the balance of the loans on or before November 30, 2000. In return, the defendant agreed to waive any unpaid legal fees, late charges, or default interest that had accrued prior to September 1, 2000. The plaintiffs made the lump sum payments approximately one week after the deadline to which the parties had agreed.
The plaintiffs did not pay the balance of the two notes on or before November 30, 2000. The plaintiffs continued to make payments on the notes and the defendant continued to accept the payments until May 31, 2001.[1]
The defendant did not notify the plaintiffs in writing of the decision to stop accepting payments until July 9, 2001. The defendant did not initiate foreclosure until July 24, 2000, eight months after the plaintiffs failed to pay the balance.
The plaintiffs were able to find a buyer for the properties. At the closing on August 29, 2001, the plaintiffs were required to pay the defendant $40,429.84, in addition to the amounts required to pay off the two notes. This $40,429.84 consisted of interest charged at the default rate specified in the notes as well as late charges and attorneys fees. The plaintiffs, believing they were being charged monies that they did not owe, paid the charges under protest. The plaintiffs were also required to pay the Town of Norwich $7,961.53 in back taxes, as well as $932.97 in interest on the back taxes. The plaintiffs seek damages, punitive damages, attorneys fees and interest.
Plaintiff's Breach of Contract Claim
The plaintiffs' first count is a claim for breach of contract. The court finds that the defendant breached its contract with the plaintiffs. Each time the defendant charged the plaintiffs interest or CT Page 1988 late charges in excess of the promissory notes, as amended by the Agreement, they were in breach of contract. Both the promissory notes and the Agreement specified under what conditions the plaintiffs were to be charged the penalty interest and late charges. Late charges and default interest charged from September 1, 2000 until November 30, 2000 were breaches by the defendant. The defendant committed further breach when it charged the plaintiffs for attorneys fees that it accumulated from September 1, 2000 until November 30, 2000. Additionally, the portion of the payments made by the plaintiffs that were put toward the inappropriate late charges and default interest, were not put towards the escrow account. This also was a breach of the contracts the parties entered into by the defendant. Therefore, any late charges and default interest paid from September 1, 2000 until November 30, 2000 should have been credited as payment on the principal, interest and escrow.
The agreement between the parties dated September 1, 2000, states in part, "The bank agrees to waive attorneys fees, default interest and late charges up to and including this date (the total of which is approximately $17,000.00). This waiver is specifically conditioned upon your clients' full performance of this proposed settlement agreement." (Plaintiffs' Exhibit 1, § b.) This Agreement pertained to both mortgages (Note 12511 and Note 12557). "Your clients will have a period of 60 days, that is, up to and including November 30, 2000, [to] pay the bank the entire remaining balance of both loans . . ." (Plaintiffs' Exhibit 1, § g.) "Your clients must remain current and not in default on both loans during the period referred to in paragraph g, above. The only exception is that your clients will not be required to provide the bank with financial statements and/or tax returns during that period." (Plaintiffs' Exhibit 1, Sec. h.) "To the extent that the borrowers . . . [default] under the terms of this letter agreement, this shall, at Tolland Bank's option, constitute a default under that certain promissory note in the original principal amount of $135,000.00 dated June 22, 1998, from Smithfield Associates, LLC, and Zane R. Magos, Jr., to Tolland Bank and a default under that certain promissory note in the original principal amount of $124,000.00 dated September 3, 1998, from Smithfield Associates, LLC, and Zane R. Megos, Jr., to Tolland Bank and allow Tolland Bank to exercise any and all legal rights and remedies at its disposal including without limitation a direct collection action on the above referenced notes and/or a foreclosure action on any collateral including any mortgages securing the notes referenced above." (Plaintiffs' Exhibit 1, Sec. i.)
When the plaintiffs failed to pay the mortgage balances by November 30, 2000, they breached the agreement and were in default. Under the language of the Agreement, Section b, this breach allowed the defendant CT Page 1989 to reinstate the attorneys fees, default interest and late charges for the mortgage payments that were outstanding on September 1, 2000. However, the defendant waived its right to accelerate the payment of the debt and these same late charges and default rate interest outstanding on September 1, 2000 because it accepted payments from the plaintiffs after November 30, 2000, and because of its delay in moving to assert its rights under the agreement.
"Waiver is the intentional relinquishment of a known right . . . To constitute waiver there must be both knowledge of the existence of the right and intention to relinquish it . . . Waiver involves the idea of assent, and assent is an act of understanding." (Citations omitted; internal quotation marks omitted.) Novella v. Hartford Accident indemnity Co., 163 Conn. 552, 561, 316 A.2d 394 (1972). "This presupposes that the person to be affected has knowledge of his rights, but does not wish to assert them. Intention to relinquish may appeal but acts and conduct inconsistent with intention [to assert a right] are sufficient . . . Waiver is a fact or a conclusion from facts. Where there is no express waiver, one may be implied. Such a waiver may be found as an inference of fact from the conduct of the plaintiff under the circumstances of the case." (Citation omitted; internal quotation marks omitted.) Hendsey v. Southern New England Telephone Co., 128 Conn. 132,135-36, 20 A.2d 722 (1941).
The plaintiffs made payments on both mortgages and these payments were accepted by the defendant. (Plaintiffs' Exhibits 6 and 7.) Therefore any late charges that were unpaid by the plaintiffs as of September 1, 2000, which were later paid, are awarded to the plaintiffs. The defendant did not demand full payment of the loans. Instead, it accepted the payments and continued to send regular bills to the plaintiffs with stated payments less than the balance of the loans. The plaintiffs will not recover interest paid at the default rate or late charges paid prior to September 1, 2000 as the Agreement stated that the bank would waiveunpaid late charges and interest.
Had the defendant included language in the Agreement stating that a delay in exercising any rights under the agreement was not a waiver, the outcome may have been different. Gaynor v. Union Trust, Co., 216 Conn. 458,468, 582 A.2d 190 (1990); Christensen v. Cutaila, 211 Conn. 613, 619-20,560 A.2d 456 (1989); S.H.V.C., Inc. v. ROY, 37 Conn. Sup. 579, 583,428 A.2d 806, cert. denied, 188 Conn. 503, 450 A.2d 351 (1981). But this is not the case. There is a "waiver clause" in the promissory notes, but there is no language that incorporates it into the Agreement. Both parties are experienced business entities and could have incorporated a "waiver clause" into the agreement. The court will not read additional CT Page 1990 provisions into the Agreement. Here, the parties agreed to modify the terms of promissory notes. It would have been a simple task to insert language that a failure by the defendant to immediately exercise its rights would not have resulted in a waiver of those rights. This was not done.
Furthermore, the defendant's waiver of its rights is evidenced by its September 29, 2000 signature on the Agreement. The defendant's signature, made two weeks after the plaintiffs brought the accounts up-to-date, ratified the late payment made by the plaintiffs. The defendant accepted the one week late payment in satisfaction of the performance required by the Agreement. If the court were to read the Agreement as containing a "waiver clause," the defendant would have had the right to foreclose despite its ratification. Such an outcome would be inconsistent with notions of fair play and justice. A bank, at its whim, could reinstate fees, despite leading the borrower to reasonably believe that it had accepted its actual performance of paying one week late.[2]
Beginning in late December, the plaintiffs failed to pay the monthly payments on time. As such, the plaintiffs were in default and could be charged late fees, default interest and attorneys fees in accordance with the original promissory notes. (Defendant's Exhibits 6 and 7.) Thus, the plaintiffs are not entitled to a return of any default interest or late charges accumulated after November 30, 2000 that they paid at the closing. The plaintiffs have not proved to the court that the monthly payments, as calculated by the bank for the month of December 2000 and onward, were improperly calculated or otherwise did not conform to the terms of the original promissory notes. Therefore, the payments made by the plaintiffs after November 30, 2000 were insufficient, and, as a result, the escrow accounts could not be fully funded. The failure of the defendant to pay taxes that accrued after November 30, 2000 was not its fault. The defendant could not pay taxes from an escrow account which was not properly funded. Prior to November 30, 2000, however, the escrow accounts were fully funded. Any deficiencies in the funding of the escrow accounts were brought up to date by the plaintiffs when they made the lump sum payments on the mortgages in September 2000. Since the plaintiffs remained up to date in their payments until December 2000, the escrow accounts from which the defendant should have paid the property taxes remained fully funded under the terms of the original promissory notes. Therefore, any tax bills due on taxes which accrued prior to December 2000 should have been paid by the defendant.
However, because the plaintiffs were late in their payments, and did not bring the accounts up to date until September 2000, the defendant is not responsible for any interest that accrued before the accounts were CT Page 1991 brought up to date. Interest accrued because the plaintiffs were late in making the payments on the notes. The defendant should not be penalized for the plaintiff's failure to make the payments on the notes. They are only responsible for ensuring that the designated money paid by the plaintiff is used to pay the taxes. The taxes on the two properties were $6,732.58 as of October 1, 1999, not including the interest, which was $473.32. (Plaintiffs' Exhibits 27 and 28.) The plaintiffs claim in their memorandum of law that they paid the Town of Norwich $7,961.53 in taxes, and $932.97 in interest. There were no exhibits submitted to support the higher amounts claimed in the plaintiffs' memorandum of law. Therefore, the court finds that the plaintiffs paid the Town of Norwich $6.732.58 in taxes and will award the plaintiffs the same amount. The defendant should have paid the taxes when the plaintiffs brought both accounts up to date in September 2000. The plaintiffs will not be awarded the interest they paid on the taxes because the interest accrued prior to the plaintiffs' replenishing of the accounts current until September 2000.
DAMAGES CALCULATIONS UNDER PLAINTIFFS' BREACH OF CONTRACT CLAIM
 Promissory Note 12511 (Defendant's Exhibit 2) 
Each time the plaintiffs did not pay the full amount due on a given statement, they were assessed a late charge of $64.66. As of September 1, 2000, the plaintiffs had accumulated $517.28 in unpaid late charges on mortgage 12511. The agreement signed by the parties on September 1, 2000, agreed to waive all unpaid late charges, default interest, and attorneys fees prior to that date, upon payment of the outstanding balance. The plaintiffs did so. There was no outstanding balance prior to December 2000, so no further late charges should have accrued to the plaintiffs until then. At the closing, the plaintiffs were required to pay the $517.28.
The default interest prior to September 1, 2000, collected by the defendant at the closing, was $4,209.74. (Defendant's Exhibit 18.) Because the defendant waived its right to the default interest, as explained above, the plaintiffs are entitled to a return of the $4,209.74.
 Promissory Note 12557 (Defendant's Exhibit 3) 
Each time the plaintiffs did not pay the full amount due on a given statement, they were assessed a late charge of $64.66. As of September 1, 2000, the plaintiffs had accumulated $481.72 in unpaid late charges on mortgage 12557. The agreement signed by the parties on September 1, 2000, agreed to waive all unpaid late charges, default interest, and CT Page 1992 attorneys fees prior to that date, upon payment of the outstanding balance. The plaintiffs did so. The plaintiffs made all payments in the proper amounts until December 2000. There was no outstanding balance prior to December 22, 2000. The plaintiffs paid $278.77 in late charges on December 18, 2000. This payment was put toward late charges accumulated prior to September 1, 2000 and/or to late charges incorrectly attributed to the plaintiffs in the September 21, 2000 and October 23, 2000 statements. The plaintiff also had an outstanding $220.43 in late charges on the November 21, 2000 statement, which was reinstated and paid by the plaintiffs at the closing. The total amount paid in late charges accrued or otherwise based on outstanding balances prior to September 1, 2000 is $499.20.
The uncollected default interest that had accrued prior to September 1, 2000, was $3,708.24, which was paid by the plaintiffs at the closing. (Defendant's Exhibit 19.) Because the defendant waived its right to the default interest, as explained above, the plaintiffs are entitled to a return of the $3,708.24.
 Attorneys Fees Paid by Plaintiffs at the August 2001 Closing
Because of the defendant's waiver of its rights under the Agreement,supra, p. 5, the plaintiffs are entitled to an award equal to the amount of attorneys fees that were outstanding as of September 1, 2000, which they were required to pay at the closing. The plaintiffs accrued $13,563.63 in unpaid attorneys fees, which were paid by the plaintiff at the closing of the two properties. (Defendant's Exhibit 29.) The plaintiff is awarded $13,563.63 because the defendant had waived its right to collect these attorneys fees by accepting mortgage payments after November 30, 2000.
The plaintiffs are entitled to an award of the attorneys fees, which were alleged to have been incurred by the bank from September 1, 2000 to December 22, 2000, which the plaintiffs were charged at the closing of the two properties. The defendant was not in default until it failed to pay the monthly mortgage payments in December 2000. (Defendant's Exhibits 6 and 7.) As the plaintiffs were not in default under either the September 1, 2000 agreement, or the original promissory notes, they cannot be compelled to pay legal fees accrued by the bank during this period. The total amount of attorneys fees incurred by the bank during this period, is $1,880.83, which the plaintiffs were required to pay at the closing. The plaintiffs are awarded $1,880.83.
 Closing Attorneys Fees
CT Page 1993
The bank, in its testimony, brief and affidavit on attorneys fees, acknowledged that it overcharged the plaintiffs $1,502.58 in attorneys fees at the closing. Therefore, plaintiffs are entitled to an award of this amount.
 Prejudgment Interest
In accordance with General Statutes § 37-3a, the court awards the plaintiffs ten percent interest per year on all damages other than the punitive damages and the attorneys fees incurred to bring this action. "Except as provided in sections 37-3b, 37-3c and 52-192a interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable." Connecticut General Statutes § 37-3a. "A trial court must make two determinations when awarding compensatory interest under § 37-3a: (1) whether the party against whom interest is sought has wrongfully detained money due the other party; and (2) the date upon which the wrongful detention began in order to determine the time from which interest should be calculated."Rapin v. Nettleton, 50 Conn. App. 640, 651, 718 A.2d 509 (1998). The interest shall accrue from September 1, 2001 at which time it became payable to the plaintiffs as it was wrongly charged and subsequently wrongly detained by the defendant. Ten percent interest on $33,843.23 for seventeen months noncompounded is $4,794.42.
Damages Awarded to the Plaintiffs Under the Breach of Contract Claim
$517.28 — Late charges incurred prior to September 1, 2000 on loan 12511 that were paid by the plaintiffs at the closing.
$499.20 — Late charges incurred prior to September 1, 2000 on loan 12557 that were paid by the plaintiffs at the closing.
$1,502.78 — Attorneys fees wrongfully alleged to have been incurred by the defendant that were paid by the plaintiffs at the closing.
$13,563.63 — Attorneys fees incurred by defendant prior to September 1, 2000 on both loans that were charged to the plaintiffs at the closing.
$1,880.83 — Attorneys fees incurred by the defendant from September 1, 2000 to November 22, 2000 that were paid by the plaintiffs at the closing. CT Page 1994
$4,209.74 — Default interest incurred prior to September 1, 2000 on loan 12511 that was paid by the plaintiffs at the closing.
$3,708.24 — Default interest incurred prior to September 1, 2000 on loan 12557 that was paid by the plaintiffs at the closing.
$7,961.53 — Taxes paid by the plaintiffs to the town of Norwich at the closing that should have been paid out of the escrow account by the defendant.
$4,794.42 — Interest on damages other than punitive damages and plaintiffs' attorneys fees for this action.
TOTAL: $38,637.65
Plaintiff's Claim Under the Connecticut Unfair Trade Practices Act
The second claim of the amended complaint claims damages against the defendant for unfair or deceptive acts or practices in the conduct of their trade or business under the Connecticut Unfair Trade Practices Act ("CUTPA"). The banking industry is governed by CUTPA. Normand JosefEnterprises v. Connecticut National Bank, 230 Conn. 486, 521, 464 A.2d 1289
(1994). "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the `cigarette rule' by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons] . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) Willow Springs CondominiumAssociation, Inc. v. 7th BRT Development Corp. , 245 Conn. 1, 43,717 A.2d 77 (1998). A breach of contract, even if intentional, does not violate CUTPA unless the claimant shows substantial aggravating circumstances surrounding the breach. Foley v. The Huntington Co., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 87 246145 (March 16, 1994, Fuller, J.).
The defendant's acts were unfair and deceptive. The defendant CT Page 1995 represented in the promissory notes that it signed with the plaintiffs that it would only charge late fees and a higher default interest rate if the plaintiffs were in default. The plaintiffs reasonably took this language at its face value and relied on it when entering into the contracts. Had they known that the bank would implement these charges in a harum-scarum manner, they would not have entered into the contracts. Further, the defendant's refusal to return money it overcharged the plaintiffs forced the plaintiffs to seek redress in the courts. "This is the type of behavior CUTPA seeks to discourage." Gebbie v. Cadle Co.,49 Conn. App. 265, 279, 714 A.2d 678 (1998). Finally, the plaintiffs suffered substantial injury as a result of the defendant's actions. Not only did the defendant breach the contracts, but also compelled the plaintiffs to pay the disputed money under threat of thwarting the sale of the properties, which would have resulted in the plaintiffs incurring further losses.
The plaintiff is awarded the attorneys fees and costs of litigating this matter under CUTPA. "[T]he public policy underlying CUTPA is to encourage litigants to act as private attorneys general and to engage in bringing actions that have as their basis unfair or deceptive trade practices . . . In order to encourage attorneys to accept and litigate CUTPA cases, the legislature has provided for the award of attorneys fees and costs . . . Once liability has been established under CUTPA, attorneys fees and costs may be awarded at the discretion of the court." (Internal quotation marks omitted.) Gebbie v. Cadle Co., 49 Conn. App. 265,279-80, 714 A.2d 678 (1998). The plaintiffs were left with no options but to redress in the courts. The plaintiffs are awarded reasonable attorneys fees in the amount of $10,906.36.
The court will not award the plaintiffs punitive damages. "[P]unitive damages are available when there is evidence of a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Internal quotation marks omitted.) Lawson v. Whitney's FrameShop, 42 Conn. App. 599, 608, 682 A.2d 1016 (1996). "Section 42-110g (a) does not provide a method for determining punitive damages. Courts have awarded punitive damages in amounts equal to actual damages or multiples of the actual damages." Id., 609.
While the defendant did act in an underhanded manner, there are circumstances which mitigate against the awarding of punitive damages in this case. The defendant compelled the plaintiffs to pay it and the Town of Norwich $33,843.23 that they did not owe, under threat by the defendant to thwart the sale of the properties, which would have resulted in the plaintiffs incurring further losses. Furthermore, the plaintiffs disputed the amounts that the defendant claimed were owed with no attempt CT Page 1996 to evaluate their claims. The defendant also overcharged the plaintiffs for attorneys fees at the closing. The plaintiffs' two separate defaults on these notes, however, is a mitigating factor. While this in no way excuses the defendant's behavior of using the situation to its favor to compel payment of monies that were not due to it, the court is mindful that the plaintiffs had obligations of their own. Therefore, the court will limit the plaintiffs' recovery to the reasonable attorneys fees they incurred, and not award punitive damages.
 Damages awarded to the Plaintiffs under CUTPA
$10,906.36 — Plaintiffs' attorneys fees for this action.
Defendant's Counterclaim
The defendant's counterclaim, which asks the court to award it attorneys fees based on language contained in the promissory notes, is denied. The court does not find that the defendant has proven that the plain meaning of the language requires that the plaintiffs pay the defendant's attorneys fees where judgment is entered for the plaintiff and against the defendant. The notes on their face indicate that the plaintiffs will be responsible for the bank's attorneys fees in any action where the defendant is not at fault, or, at a minimum, has judgment entered against it.
Furthermore, the court finds no case law where a party found to be in violation of CUTPA was awarded attorneys fees. Such an outcome would circumvent the intent of the legislation. A search of the case law also shows no cases where the party prevailing in a breach of contract claim was required to pay the attorneys fees of the party found to have breached said contract. To award the defendant attorneys fees in this situation would be to deny justice and reason. Lex est dictamenrationis.
Conclusion
The court enters judgment for the plaintiffs under the breach of contract claim in the amount of $38,637.65. The court enters judgment for the plaintiffs under the CUTPA claim in the amount of $10,906.36. The total damages awarded to the plaintiffs are $49,544.01. The court enters judgment for the plaintiffs on the defendant's counterclaim.
D. Michael Hurley, JTR